**E-FILED**

Wednesday, 21 November, 2007  03:18:38 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| SMS DEMAG AKTIENGESELLSCHAFT, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. 06-CV-2065** |
| | ) | |
| MATERIAL SCIENCES CORPORATION, | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |
| TERRONICS DEVELOPMENT | ) | |
| CORPORATION, | ) | |
| **Intervenor-Plaintiff/** | ) | |
| **Counter-Defendant** | ) | |
| v. | ) | |
| | ) | |
| MATERIAL SCIENCES CORPORATION, | ) | |
| | ) | |
| **Intervenor-Defendant/** | ) | |
| **Counter-Plaintiff** | ) | |

## <u>OPINION</u>

This case is before the court for ruling on the Motions for Summary Judgment (#65, #66) filed by Defendant Material Sciences Corporation (MSC).  Following this court's careful consideration of the arguments of the parties and the documents provided by the parties, MSC's Motions for Summary Judgment (#65, #66) are GRANTED.  However, this court's review has shown that the original Complaint (#1) filed by Plaintiff, SMS Demag Aktiengesellschaft (SMS Demag), did not adequately allege diversity jurisdiction. The Complaint (#1) alleges only that SMS Demag is a "foreign corporation."  This is not adequate to show SMS Demag's citizenship. This court must assure that it has jurisdiction over this case before judgment can be entered.  <u>See</u>

Belleville Catering Co. v. Champaign Market Place, L.L.C., 350 F.3d 691, 693 (7th Cir. 2003).[1]
MSC is directed to file, within 14 days, an affidavit setting out the citizenship of SMS Demag
pursuant to 28 U.S.C. § 1332(c)(1).  Once this court has confirmed that it has diversity jurisdiction
over this case, judgment will be entered in favor of MSC and against SMS Demag as set out in this
Opinion.  As far as the Motion for Summary Judgment (#66) as to Terronics Development
Corporation (Terronics), judgment will be entered in favor of MSC and against Terronics on
Terronics' Second Amended Complaint.  However, judgment cannot be entered in MSC's favor on
its counterclaim until evidence is presented regarding the computation of damages.

FACTS[2]

Plaintiff SMS Demag is one of the world's leading designers and suppliers of steel-making
and steel-processing equipment, including steel-coating equipment.  It owns substantial and valuable
know-how and technical knowledge in the engineering and manufacture of rolling mills and
processing lines of all kinds, and is active worldwide in engineering, building, and selling such
equipment to the metal industry.  Defendant MSC provides material-based solutions for electronic,
acoustical/thermal, and coated metal applications.  Intervenor-Plaintiff Terronics is engaged in the
development of technology for the electrostatic deposition of liquid and powder materials to a
moving substrate.

On April 11, 1994, MSC entered into a technology license agreement with Terronics.  Under

---

[1]  This court notes that, based upon a review of SMS Demag's website, it is a German
company with no offices listed in Delaware or Illinois.  Therefore, because the Complaint
alleged that MSC is a Delaware corporation with its principal place of business in Illinois, it
appears that this court has diversity jurisdiction.  However, this court must have an adequate
record showing SMS Demag's citizenship to establish its jurisdiction.

[2]  This court's recitation of the facts comes from the parties' Statements of Undisputed
Facts and the documents submitted by the parties.  This court has not included facts which are
not supported by the record before this court.

2

the terms of the agreement, Terronics granted to MSC the exclusive right to use and sublicense technology related to the electrostatic application of powder paint to various types of substrates. At approximately the same time, SMS Demag was attempting to develop an alternative color-coating process technology. The alternative technology that SMS Demag was attempting to develop represented a precursory stage in the electrostatic application of powder paint. Accordingly, SMS Demag became interested in marketing the powder-paint technology that was the subject of the technology license agreement between MSC and Terronics. Thus, in 1995, SMS Demag contacted MSC to obtain a license to market the technology. It is undisputed that, by that time, MSC had made extensive progress in the field of powder paint coating.

In 1996, SMS Demag visited MSC's facility in Elk Grove Village, Illinois, to observe the technology in practical operation. After this observation, SMS Demag told MSC that SMS Demag "consider[ed] [MSC's] development trendsetting and future-oriented." SMS Demag expressed an interest "in entering into a [license] [a]greement with [MSC]."

On July 10, 1996, following negotiations, MSC and SMS Demag entered into a written license agreement under which MSC granted to SMS Demag a worldwide right (excluding North America) and license for designing, constructing, using, and selling the technology. It is undisputed that, by that date, MSC was using the technology to successfully produce powder-paint coated steel coil under the brand name "POWDERBOND." In July 1996 alone, MSC had used the technology to successfully produce and sell approximately $26,000 worth of POWDERBOND brand coated steel coil. Overall, from 1996 to the present, MSC has used the technology to successfully produce and sell approximately $1,378,000 worth of POWDERBOND brand coated steel coil.

The license agreement between MSC and SMS Demag included written warranties. The Agreement also provided that "[t]his Agreement embodies the entire understanding of the parties

and shall supersede all previous communications, representations or undertakings, either verbal or written, between the parties relating to the subject matter hereof."

Ronald Michaelis, Ph.D., testified at his deposition that, in 1996, he was product manager of the coating business for SMS Demag.  Michaelis testified that he was involved in negotiating the license agreement with MSC to sell the technology.  He testified that he understood the integration clause and "understood that any prior representations that were made to [him] if they weren't included in the agreement were not part of the agreement."  He also testified that he understood that it was a "developing technology" and that MSC did not have large scale commercial success at that point with the technology.  He further testified that the agreement did not include any "timetable" for things to develop in a certain amount of time and that "MSC didn't promise or guaranty in the agreement that SMS would have any commercial success with selling installations or technology after entering into the agreement."

Following the parties' execution of the license agreement, SMS Demag was unsuccessful in its attempts to market the technology to its customers.  On April 12, 2004, MSC notified SMS Demag that MSC was terminating the license agreement effective six months from April 30, 2004.  MSC provided this notification to SMS Demag pursuant to a January 26, 2004, amendment to the license agreement which allowed either party to terminate the license agreement upon six months written notice after April 30, 2004.

In the meantime, effective August 1, 1996, MSC and Terronics entered into a second technology license agreement.  Under the terms of this agreement, Terronics granted MSC "an exclusive, worldwide right and license to make, have made, use, sell, offer to sell, and import the Technology, including the right to grant sublicenses thereunder."  In exchange for the license, MSC agreed to pay Terronics certain fixed and variable fees, if applicable, over a period of several years.

4

In particular, MSC agreed to pay Terronics a fixed fee of $50,000 on April 1, 1997, followed by fixed fees of $150,000 on April 1 of each year from 1998 to 2001.  MSC also agreed to pay Terronics variable fees, if applicable, each year based on the amount of sales achieved by MSC under the license.  MSC, however, was not obligated to make any variable fee payment until its sales for any given year reached a level where the variable fee that would be payable exceeded the applicable year's fixed fee.

Under the August 1, 1996, agreement, Terronics agreed to provide MSC with "technical consulting and troubleshooting services concerning the Technology" and "production Equipment and Production Units that [MSC] require[d] for its own use, sales, or leasing."  In addition, under a "TECHNOLOGY TRANSFER" section of the agreement, Terronics agreed to provide MSC all technical documentation to allow MSC to use the technology and the equipment and to support sublicenses and sales of the technology and the equipment, including schematics, theories of operation, performance, and component specifications.  Finally, the parties included a provision stating that, if the agreement terminated or expired, MSC would "return to Terronics all the Technology capable of being returned, including all technical documents provided by Terronics hereunder and any copies thereof."

On November 20, 1996, Terronics executed a promissory note in favor of MSC by which Terronics promised to pay $100,000 to MSC, together with 7% interest compounded continuously, on or before November 1, 2001. Subsequently, on December 17, 1997, Terronics executed a second promissory note in favor of MSC, which incorporated the amount Terronics owed to MSC under the first promissory note ($100,000 plus accrued interest of $8,484) plus an additional principal amount of $150,000.  The second promissory note thus terminated the first promissory note and, under the second promissory note, Terronics promised to pay $258,484 to MSC, together with 7% interest

compounded monthly, on or before April 1, 2002.  Under the terms of the second promissory note,

MSC agreed to "continue to pay to Terronics the minimum fees as outline[d] in the . . . license

agreement up to and including April 1st 2001 regardless of the outstanding balance due on the loan."

Terronics, however, agreed that "[a]fter April 1st 2001, MSC may at its sole discretion credit

minimum fees due for that year to any remaining outstanding balance."

On August 11, 1997, MSC proposed to Terronics that the second technology license

agreement "be amended in order to permit MSC to prepare, prosecute, maintain, enforce, and defend

all powder paint inventions."  MSC thus proposed that "all powder paint inventions of MSC or

Terronics be assigned to MSC."  On August 13, 1997, Terronics responded to MSC's proposal,

indicating that it was in "general agreement" with the proposal.  Terronics, however, questioned,

"[W]hat happens if MSC terminates the underlying [a]greement[?]"  Terronics suggested that, "in

such instance, the patents should be assigned back to Terronics."  The parties' subsequent

negotiations resulted in the creation of a written technology assignment and transfer agreement, the

third written agreement between the parties.  The written document, which stated that its effective

date was August 1998, was never formally executed by the parties.[3]

Under the terms of this third written agreement, Terronics assigned to MSC "all of its right,

title, and interest in" certain patents and patent applications related to the technology.  In exchange

for the assignment, MSC granted back to Terronics "an exclusive, world-wide, royalty-free,

irrevocable (except as elsewhere provided) right and license to make, have made, use, sell, and

import" under the patents.  MSC also agreed to be responsible for "preparing, filing, prosecuting,

---

[3] Terronics has asserted in this case that the agreement is fully enforceable.  MSC has taken the position that the agreement was not executed and is therefore not enforceable.  However, in its Motion for Summary Judgment, MSC conceded for purposes of the Motion that the agreement constitutes a valid, enforceable contract, even though it was never executed by the parties.

maintaining, enforcing, and defending" the patents.

Similar to the parties' earlier technology and license agreement, the third written agreement provided that MSC agreed to pay Terronics certain fixed fees in subsequent years. In particular, MSC agreed to pay Terronics $150,000 on April 1 of each year from 1999 through 2001. In addition, MSC agreed to pay Terronics a final fixed fee of $250,000 on April 1, 2002. MSC also again agreed to pay Terronics variable fees each year based on the amount of sales achieved by MSC, but MSC was not obligated to pay any variable fee unless it achieved sufficient sales to make the variable fee exceed the applicable fixed fee. Terronics again agreed to provide MSC with technical consulting services and equipment that MSC required for its use, sales, or leasing of the technology. In return, MSC agreed to purchase minimum amounts of consulting services and equipment each year from April 1, 1998 to March 31, 2003. It is undisputed that, under the terms of the third written agreement, the minimum amount due for services from April 1, 2002 to March 31, 2003 would be $143,360. The third written agreement also contained a "TECHNOLOGY TRANSFER" section identical to the one contained in the second technology license agreement.

The third written agreement stated, in section 10.1, that the agreement "shall commence on the Effective Date [August 1998] and it shall remain in full force and effect for five (5) years, unless earlier terminated." The agreement also included, in section 10.1.1, an automatic renewal provision. In Section 10.2, the parties stated that, if the agreement was terminated or expired, MSC "shall immediately cease manufacturing and selling the Equipment and shall immediately cease using the Technology, and shall return to Terronics all the Technology capable of being returned, including all technical documents provided by Terronics and any copies thereof." Section 10.2 further provided, however, that "[n]otwithstanding the foregoing, nothing herein shall preclude MSC from

practicing under any patent or Technology owned or otherwise licensed to MSC."[4]   Section 10.6(b)

of the written agreement stated, "if this agreement is terminated by MSC for any reason, then MSC

shall at its own cost reassign all patents transferred to MSC by Terronics . . . ."   Section 10.6(a)

provided that the "expiration, non-renewal or termination of this [a]greement shall have no effect

on any license or sub-license of the Technology granted by MSC prior to and in effect on the date

of such expiration, non-renewal or termination."

Following the parties' negotiation of the third written agreement, Terronics assigned several

of its technology-related patents to MSC, and MSC paid Terronics its fixed-fee payments of

$150,000 in 1999, 2000, and 2001.   MSC did not, however, make any variable fee payments to

Terronics during those years because it is undisputed that MSC never achieved sufficient sales to

trigger an obligation to pay a variable fee.

On October 9, 2001, Terronics president, Eduardo C. Escallon, sent a letter to Doug Edwards

of MSC.   In the letter, Escallon stated that Terronics had experienced cost overruns in setting up a

powder coating line, referred to by the parties as Line 15.   Escallon stated that, at a meeting held on

September 1, 2001, Terronics had proposed that the interest charges due on the promissory notes

be deducted from the $250,000 payment due from MSC on April 1, 2002, and that the remaining

principal plus interest be deducted from the $440,000 payment due from MSC in 2003.   Escallon

also stated that they had agreed to "clos[e] out the first 100,000 dollar note."   Escallon stated that

Terronics would "be pleased to sign a suitable Note document" that encompassed these terms.   The

letter included a signature line for Doug Edwards to indicate his agreement.   It is undisputed that

Edwards did not sign the letter.   In his affidavit, Escallon stated that he met with Edwards on

October 12, 2001, and "Edwards expressed his concurrence."   Edwards stated in his affidavit that

---

[4]  Section 10.2 in this written agreement was identical to section 10.2 in the second
technology license agreement.

he "never expressed any concurrence with the October 9, 2001 memorandum." Edwards stated that he "refused to sign the memorandum because its contents are not true."

On February 10, 2002, in furtherance of Terronics' promise to provide MSC with technical consulting services and equipment that MSC required for its use, sales, or leasing of the technology, MSC and Terronics entered into an agreement pursuant to which Terronics agreed to modify an electrostatic powder coating assembly in exchange for payment of $32,180.  On February 27, 2002, Terronics submitted an invoice for this work and, on February 28, 2002, MSC tendered a check to Terronics in the amount of $32,180.  Escallon testified that this work was not completed and the equipment was never provided to MSC.[5]

On April 9, 2002, as MSC's final fixed-fee payment of $250,000 became due, MSC sent a letter to Terronics stating that MSC would exercise its right under the promissory note to credit the amount of MSC's obligation against the outstanding balance of the promissory note, which MSC stated was $349,733.00 as of that date.  On May 6, 2002 Terronics rejected MSC's credit of the $250,000 fixed-fee payment against the outstanding balance of the promissory note, and Terronics opined that MSC's failure to pay Terronics $250,000 constituted a "material breach" of the written agreement.  Terronics further stated that, if MSC failed to pay $250,000 to Terronics within 90 days, Terronics would "consider the [a]greement terminated."  On May 21, 2002, Terronics notified MSC that it would "no longer provid[e] support to MSC activities."

PROCEDURAL BACKGROUND

On May 14, 2004, SMS Demag filed a lawsuit against MSC in the Southern District of Illinois.  On March 10, 2006, the parties entered into a stipulation whereby the parties agreed that the case in the Southern District would be dismissed without prejudice and the case would be refiled

---

[5] Escallon claimed that the equipment was not completed or provided to MSC because of MSC's failure to make its contractual payments.

in the Central District of Illinois.

Therefore, on April 5, 2006, SMS Demag filed a Complaint (#1) against MSC in this court.[6] In Count I, SMS Demag alleged that MSC breached the written license agreement because MCS failed to ever build a North American Demonstration plant and, on or about April 12, 2004, abandoned powder cloud technology to the detriment of SMS Demag.  In Count II, SMS Demag alleged that MSC breached the written license agreement when it "failed to make any reasonable adjustment to the end-user requirements such that SMS Demag AG could continue to convince customers to buy Powder Cloud technology," to the detriment of SMS Demag.  In Count III, SMS Demag alleged that MSC breached express warranties contained in the written license agreement. Specifically, SMS Demag alleged in par. 93(a) of its Complaint that MSC failed to "[m]aintain the rights to the technology . . ., rights which do not infringe the rights of others."  In par. 93(b) of its Complaint, SMS Demag alleged that MSC failed to "[t]ransfer to SMS [k]now how and technical data which [was] proven by production and without defect."

On June 14, 2006, this court entered an Opinion (#31) in which this court concluded that venue was proper in this court.  This court also granted Terronics' Motion to Intervene (#26). Terronics' Intervenor Complaint (#32) against MSC was then filed in this court.  Subsequently, Terronics was allowed to file a Second Amended Complaint (#54).  Terronics' Second Amended Complaint alleged that this court has diversity jurisdiction because Terronics is a citizen of Indiana in that it is incorporated in Indiana and has its principal place of business in Indiana and MSC is a citizen of Illinois because it is incorporated in Illinois and has its principal place of business in

---

[6] As this court has noted, SMS Demag alleged that this court has diversity jurisdiction, but did not adequate allege SMS Demag's citizenship.

Illinois.[7]   In Count I of its Second Amended Complaint, Terronics alleged that MSC breached the written agreement by failing to pay fees due on April 1, 2002, in the amount of $250,000, by failing to pay $143,400[8] due in the year 2002, and by failing to pay the minimum guaranteed fee in the amount of $440,000 due on April 1, 2003, April 1, 2004, April 1, 2005, and April 1, 2006.  Terronics sought damages for breach of contract in the total amount of $2,153,400 and also sought "an order compelling MSC to transfer the Technology back to Terronics, including re-assignment of the patents to Terronics."  In Count II, Terronics alleged, in the alternative, that MSC was liable for quantum meruit.  In Count III, Terronics also alleged, in the alternative, that MSC was liable for unjust enrichment.  In Count IV, Terronics sought injunctive relief in connection with Count I, specifically a preliminary injunction compelling MSC to "transfer the Technology back to Terronics, including re-assignment of the patents to Terronics."  Terronics sought a hearing on its request for a preliminary injunction.

On January 10, 2007, MSC filed its Answer to Second Amended Complaint and Counterclaim (#56).  MSC also filed a Memorandum in Opposition to Terronics' Motion for Hearing on Preliminary Injunction (#57).  On March 15, 2007, this court entered an Opinion (#61).  This court granted Terronics' Motion for a Preliminary Injunction Hearing.  Subsequently, a hearing was scheduled for June 28, 2007, at 9:30 a.m.   On May 31, 2007, Magistrate Judge David G. Bernthal held a telephone status conference in this case.  At that time, Judge Bernthal granted a joint

---

[7]  This court notes that, in its Answer (#62), MSC denied that it was incorporated in Illinois.  In its Answer to SMS Demag's Complaint (#7), MSC admitted that it was incorporated in Delaware.  However, because MSC is a citizen of Delaware and Illinois and Terronics is a citizen of Indiana, complete diversity exists and this court has subject matter jurisdiction.

[8]  In its statement of undisputed facts, MSC stated that the amount due under the agreement was $143,360.  This fact was admitted by Terronics.  However, Terronics' Second Amended Complaint and the parties' arguments state that the amount alleged to be due was $143,400.  This is the figure this court will use for the remainder of this Opinion.

11

oral motion to vacate the preliminary injunction hearing.  A deadline of June 21, 2007, was set for the parties to submit Stipulated Facts and Memoranda regarding Terronics' request for a preliminary injunction.  Judge Bernthal later extended the deadline and, on July 6, 2007, Terronics filed a Consent Motion to Withdraw Request for Preliminary Injunction (#64).  Terronics stated that it "had intended to pursue commercialization of the Technology but that opportunity has become moot with the passage of time."  Terronics further stated that it continued to seek the reassignment of Technology from this court, but that could be obtained at the trial scheduled for November 2007.

In the meantime, MSC was allowed leave to file an Amended Counterclaim (#62).  In Count I of its Amended Counterclaim, MSC alleged that Terronics had a remaining balance on the Promissory Note of at least $71,683.52 as of May 31, 2002.  This amount was computed by setting off the April 1, 2002, $250,000.00 fixed fee payment MSC notified Terronics it was applying to the balance of the Promissory Note and also setting off the amount Terronics would have received in profit assuming that MSC had an obligation to pay Terronics for minimum guaranteed consulting services, equipment and engineering for the year 2002, which MSC calculated to be $28,672.00. MSC sought judgment against Terronics in the amount of $71,683.52, plus accrued interest.  In Count II, MSC sought, in the alternative, the remaining balance of $258,484.00 due on the Promissory Note.  This was the remaining balance computed with no setoffs.  In Count III, MSC sought $32,180.00, the amount it paid Terronics for work Terronics did not perform.

On August 31, 2007, MSC filed a Motion for Summary Judgment against SMS Demag (#65) with supporting exhibits.  MSC also filed a Motion for Summary Judgment against Terronics (#66) with supporting exhibits.  On September 20, 2007, SMS Demag filed its Response to Motion for Summary Judgment (#67) with supporting exhibits, and Terronics filed its Response to Motion for Summary Judgment (#68) with supporting exhibits.  MSC filed a Reply (#69, #70) to each Response

on September 27, 2007.  The summary judgment motions are fully briefed and ready for ruling.[9]

## ANALYSIS

### I.  SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Summary judgment is not warranted when there are genuine issues of material fact with respect to the interpretation of a contract.   Cherry v. Auburn Gear, Inc., 441 F.3d 476, 481 (7th Cir. 2006).    However, the "interpretation of an unambiguous contract is a question of law, and therefore a dispute over the terms of an unambiguous contract is suited to disposition on summary judgment."  Utility Audit, Inc. v. Horace Mann Serv. Corp., 383 F.3d 683, 687 (7th Cir. 2004).

In ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303, 213 F. Supp. 2d 917, 929 (C.D. Ill. 2002).  Speculation, however, is not the source of a reasonable inference.  See Burwell, 213 F. Supp. 2d at 929, citing Chmiel v. JC Penney Life Ins. Co., 158 F.3d 966, 968 (7th Cir. 1998).  Therefore, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 248.  Summary

---

[9]  On October 17, 2007, this court entered a text order and vacated the final pretrial conference set for November 16, 2007, and the jury trial scheduled for November 26, 2007.

judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1111 (7th Cir. 2004). "It is well settled that conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment." Smith v. Masterbrand Cabinets, Inc., 2006 WL 1320464, at *6 n.5 (C.D. Ill. 2006), citing Lucas v. Chicago Transit Auth., 367 F.3d 714, 726 (7th Cir. 2004).

## II.  MOTION FOR SUMMARY JUDGMENT AS TO SMS DEMAG

In its Motion for Summary Judgment, MSC argued that it was entitled to summary judgment on Counts I and II of SMS Demag's Complaint because the terms of the written license agreement did not obligate MSC to construct a demonstration plant or adjust end-user requirements and because MSC properly terminated the license agreement by notice given on April 12, 2004.  MSC argued that it was entitled to summary judgment on Count III because MSC did not breach any warranty regarding its rights to the technology and did not breach any warranty regarding the performance of the technology.

### A.  COUNTS I AND II

In its Response to MSC's Motion for Summary Judgment, SMS Demag stated that it "voluntarily dismisses Counts I and II of the Complaint . . . and elects to proceed to trial on Count III."  SMS Demag also stated that it was not proceeding with its claim in Count III in paragraph 93(a).  In its Reply, MSC argues that, because SMS Demag has withdrawn the claims asserted in Counts I and II, as well as paragraph 93(a) of Count III, MSC is entitled to summary judgment in its favor on those claims.  This court agrees with MSC that voluntary dismissal of these claims is not appropriate where a motion for summary judgment related to the claims has been filed.  See Pace v. S. Express Co., 409 F.2d 331, 334-35 (7th Cir. 1969); see also Wojtas v. Capital Guardian Tr. Co.,

477 F.3d 924, 927 (7th Cir. 2007).  Because SMS Demag has not opposed summary judgment on these claims, summary judgment will be entered in favor of MSC.

### B.  SMS DEMAG'S MOTIONS TO STRIKE

In its Response, SMS Demag included "Motions to Strike."  This court notes that these Motions to Strike were not docketed as motions.  In any case, SMS Demag first argued that this court should strike a "slanderous and inaccurate allegation made by MSC in its Motion."  In a footnote in its Motion for Summary Judgment, MSC stated that the law suit was previously filed in the Southern District of Illinois and that SMS Demag voluntarily dismissed that lawsuit while a motion for summary judgment was pending.  SMS Demag stated that this was "an outlandish representation" because the dismissal of the Southern District case was pursuant to a stipulation by both parties.  SMS Demag also asked this court to strike a statement made by Dr. Stefan Steenken, which MSC included as an exhibit in support of its Motion for Summary Judgment.  SMS Demag argued that this exhibit is privileged so that this court should strike the exhibit and all references to it in MSC's Motion.

In its Reply, MSC first stated that SMS Demag's request to strike the footnote in its Motion for Summary Judgment is without merit because the footnote accurately stated the facts regarding the earlier case.  MSC stated that it included those facts to explain why two of the exhibits attached to its Motion had captions from the Southern District of Illinois.  MSC also argued that SMS Demag disclosed Dr. Steenken's statement as part of its initial disclosures pursuant to Rule 26(a)(1)(B) of the Federal Rules of Civil Procedure and thereby waived any claim of privilege.  MSC further pointed out that the exhibit pertained only to Counts I and II of the Complaint, which have now been withdrawn.

This court notes that Motions to Strike are disfavored.  See Orr v. Roberson Mgmt Corp.,

2007 WL 809665, at *1 n.1 (C.D. Ill. 2007).  This court is confident that it can rely only on admissible evidence and proper and accurate statements of the facts in ruling on a Motion for Summary Judgment.  Therefore this court declines to strike MSC's footnote.  In addition, because it is no longer pertinent to any matter at issue in this case, this court finds the request to strike Dr. Steenken's statement moot.

## C.  COUNT III

SMS Demag has stated that it is proceeding only on its claim in par. 93(b) of Count III, in which it alleged that MSC breached an express warranty in the license agreement when MSC failed to "[t]ransfer to SMS [k]now how and technical data which [was] proven by production and without defect."  MSC argues that it is entitled to summary judgment on this claim because it did not make such a warranty in the license agreement.  MSC argues that it only warranted that the know-how and technical data provided under the license agreement included those that MSC used itself in production and that, to the best information of MSC, the know-how and technical information was correct, without substantial defect, and use of the technology made possible the coating of steel coil with powder paint.  MSC contends that "[i]ndisputably, MSC had put the technology into successful use at the time the parties entered into the license agreement, the technology was capable of producing powder-coated steel coil, and MSC made the technology available to SMS Demag AG."  MSC notes that SMS Demag has admitted that MSC had successfully implemented to technology on two lines at MSC's facility in Illinois, and that MSC successfully produced and sold POWDERBOND brand coated steel coil.   Moreover, it is undisputed that SMS Demag observed the technology in practical operation at MSC's facility prior to entering into the license agreement.  MSC argues that "the technology was significantly more advanced than competing technology that SMS Demag AG was developing, and that is why SMS Demag AG decided to license the

technology from MSC.  MSC acknowledged that SMS Demag's subsequent marketing of the technology was unsuccessful, but argues that SMS Demag cannot rewrite the terms of the contract to impose performance and marketability guarantees that were not included in the express terms of the license agreement.

In its Response, SMS Demag argues that there is a genuine issue of material fact regarding whether MSC breached express warranties made under the terms of the license agreement.  In support of this argument, SMS Demag first referred to the affidavit of Eduardo Escallon, Terronics' president.  According to SMS Demag, Escallon's affidavit states that "the technology never met the representations given SMS, even at the time that Line 15 shutdown, in mid-2002" and that "SMS and Terronics were never given the opportunity to interface with respect to the technology, arguabl[y] just so that SMS would not understand the relative infancy of the technology."  SMS Demag next referred to the affidavit of Werner Willi Bechem.  According to SMS Demag, Bechem's affidavit states that "the Line 15 'demonstration of technology' never satisfied a single customer of SMS Demag AG" and that "SMS was unaware of the lack of maturity of the technology when the agreement between SMS and MSC was signed."  SMS Demag also referred to a February 15, 1998, letter from Douglas Edwards of MSC in which, according to SMS Demag, Edwards stated that MSC "could not do what MSC promised SMS it could do."  SMS Demag also relied upon representations made in letters sent by MSC during the negotiation of the license agreement.

In arguing that a genuine issue of material fact exists regarding the breach of express warranties, SMS Demag has referred to specific provisions in the license agreement.[10]  These provisions stated:

> 10.2    The Know-how and technical data which are provided under

---

[10]  This court agrees with MSC that SMS Demag has not accurately stated the actual language used in the license agreement in making its arguments.

this Agreement include those which MSC uses itself in

production.  To the best information of MSC, the Know-how

and technical information is correct and without substantial

defect, use of the Know-how and technical data, if applied

correctly in accordance with MSC drawings, specifications,

and procedures, makes possible the manufacture of

POWDERBOND™ brand coated steel coil and the technical

information is complete.  If incorrectness is found, MSC is

obliged to correct such information, documents, data etc. at

MSC's expense up to the amount of the license fee paid by

SMS, according to Article S-4 (Payments).

The Agreement stated that "SMS will be given the process information and considerations that MSC

has assured in developing the curing technology for the powder system."  The Agreement stated that

"SMS will be given reasonable support in tailoring the existing technology for SMS's particular

specifications."   The Agreement also stated that "SMS will be updated on equipment design

improvements and documentation affected will be updated" and that "MSC will provide SMS with

written updates on performance lessons learned, production problems, application problems and the

such from MSC's own production experiences."

SMS Demag claims that MSC materially breached the section 10.2 warranty by

misrepresenting the level of production and thus not transferring know-how "proven by production

and without defect."  SMS Demag also argues that "[c]ertainly the technology was defective for

some applications, and there were representations made to [Terronics] which were withheld from

SMS, along with a myriad of facts not represented by MSC both within and outside of MSC's own

production test data."  SMS Demag also argues that a genuine issue exists "as it relates to the inactions of MSC in its failure to accurately represent and transfer 'production-proven' know-how and technical data without defect, and, in addition, transfer specific items of this know how including curing technology, lessons learned, technical bulletins, and other design details."

In its Reply, MSC argues that SMS Demag has completely failed to present any admissible facts to support its claim that MSC breached express warranties included in the license agreement. This court agrees.

The parties do not dispute that Illinois law governs this dispute.  In this case, the license agreement at issue contains an express integration clause.  Illinois law provides that "where parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misrepresentations which might arise from extrinsic evidence."  Air Safety, Inc. v. Teachers Realty Corp., 706 N.E.2d 882, 885 (Ill. 1999).  "The integration clause makes clear that the negotiations leading to the written contract are not the agreement."  Air Safety, Inc., 706 N.E.2d at 885 (emphasis in original).  In addition, it is well settled that "courts are not in the business of rewriting contracts to appease a disgruntled party unhappy with the bargain it struck."  Davis v. G.N. Mortgage Corp., 396 F.3d 869, 881 (7th Cir. 2005) (applying Illinois law), quoting PPM Fin., Inc. v. Norandal USA, Inc., 392 F.3d 889, 893 (7th Cir. 2004).  Moreover, in its Reply, MSC attached excerpts from the deposition transcript of Dr. Michaelis.  Dr. Michaelis testified that, when SMS Demag signed the license agreement, it recognized that it was "developing technology."  Dr. Michaelis also testified that the agreement contained no guarantees or timetables regarding the future development of the technology or the commercial success of SMS Demag's marketing efforts.  Dr. Michaelis admitted that when SMS Demag signed the contract, it was understood that any prior representations that were not expressly included in the agreement were not

part of the agreement. Therefore, based upon Illinois law and the record before this court, this court concludes that MSC's warranties are limited to those actually included in the written agreement. This court therefore agrees with MSC that SMS Demag's reliance on alleged representations that were not included in the license agreement cannot create a genuine issue of fact for trial.

This court notes that, although this case was originally filed in 2004, SMS Demag has presented very little evidence in support of its claim and has further presented an extremely garbled and unpersuasive argument. In short, while SMS Demag was clearly disappointed in the slow development of the technology and its inability to successfully market the technology, SMS Demag has completely failed to present evidence of a breach of any of the actual terms of the agreement.

As far as section 10.2, SMS Demag has not presented evidence that MSC breached any of the actual warranties included in that section, which did not include any warranty regarding the level of production. Moreover, if SMS Demag believed that the information provided by MSC was "incorrect," the section specifically stated that the remedy was that "MSC is obliged to correct such information, documents, data etc. at MSC's expense up to the amount of the license fee paid by SMS, according to Article S-4 (Payments)." There is no evidence that SMS Demag ever requested that MSC correct the information provided pursuant to this section. As far as the other warranties relied upon by SMS Demag, SMS Demag presented no <u>evidence</u>: that SMS Demag was not given the process information and considerations that MSC had assured in developing the curing technology for the powder system;[11] that SMS Demag was not given reasonable support in tailoring the existing technology for SMS Demag's particular specifications; that SMS Demag was not updated on equipment design improvements and documentation affected; or that MSC did not

---

[11] This court notes that it is undisputed that, at the time the parties entered into the license agreement, MSC was using the technology at its facility in Elk Grove Village, Illinois, to successfully produce powder-paint coated steel coil under the brand name "POWDERBOND."

provide SMS Demag with written updates on performance lessons learned, production problems, application problems and the such from MSC's own production experiences.

This court agrees with MSC that the affidavits of Escallon and Bechem do not provide this evidence.  In his affidavit, Escallon stated, "I vigorously deny that the Technology was developed to the state of art represented by MSC in the Original Agreement."  In its Reply, MSC attached excerpts from Escallon's deposition.  At his deposition,  Escallon testified that he had no first hand knowledge regarding the negotiation of the agreement between MSC and SMS Demag.  He also testified that he was not prepared to state where in the license agreement with SMS Demag that MSC made representations that were incorrect with respect to the state-of-the-art.  Escallon also testified that Terronics had an agreement with SMS Demag whereby Terronics would receive 50% of any recovery by SMS Demag against MSC, after attorney fees.  This court agrees with MSC that Escallon's opinion that MSC breached its license agreement with SMS Demag was conclusory and self-serving and is not a sufficient basis to avoid summary judgment.  See Smith, 2006 WL 1320464, at *6 n.5.

At his deposition, Escallon testified that "the opinions [he] gave critical of MSC were based on [his] expertise, training, education and experience in the field of electrostatic deposition and [his] education in related fields."  This court therefore agrees with MSC that Escallon's opinions constitute expert testimony.  SMS Demag did not disclose Escallon, or anyone else, as an expert in this case.  All witnesses who are to give expert testimony must be disclosed under Rule 26(a)(2)(A).  Musser v. Gentiva Health Servs., 356 F.3d 751, 756 (7th Cir. 2004); Martin v. Discount Smoke Shop, Inc., 443 F. Supp. 2d 981, 989 (C.D. Ill. 2006).  Therefore, Escallon's opinions are inadmissible and cannot establish a genuine issue of material fact for that reason as well.

As far as Bechem's affidavit, this court agrees with MSC that, because of the integration

clause, Bechem's statements regarding representations allegedly made by MSC which were not included in the written license agreement are not relevant to the claim in this case. This court further concludes that Bechem's statements regarding SMS Demag's inability to market the technology to various companies does not show the breach of any warranties actually included in the written license agreement.

### D.  CONCLUSION

For all of the reasons stated, this court concludes that MSC is entitled to summary judgment on all of SMS Demag's claims. As soon as the record adequately establishes that this court has jurisdiction over this matter, MSC's Motion for Summary Judgment will be granted and judgment will be entered in favor of MSC.

### III.  MOTION FOR SUMMARY JUDGMENT AS TO TERRONICS

In its Motion for Summary Judgment, MSC argued that this court should enter judgment in MSC's favor on Terronics' claims. MSC argued that it is entitled to summary judgment on Count I and Count IV of Terronics Second Amended Complaint because MSC satisfied its obligations under the written license agreement between Terronics and MSC and because MSC is not required to reassign the patents under the terms of the agreement. MSC argued that it is entitled to summary judgment on Counts II and III because the parties' relationship was governed by express contracts so that Terronics cannot recover for quantum meruit or unjust enrichment. MSC also argued that it is entitled to summary judgment on its counterclaim against Terronics because it is entitled to recover the balance due under the promissory note executed by Terronics and because it is entitled to restitution of the amount it paid Terronics for services that Terronics subsequently refused to perform.

### A.  COUNTS II AND III

In its Response, Terronics stated that it was voluntarily dismissing Counts II and III of its Second Amended Complaint.  It noted that these were equitable claims which were pled in the alternative because MSC had previously denied a contractual relationship.  Because Terronics has withdrawn these claims after the Motion for Summary Judgment was filed, this court concludes that MSC is entitled to summary judgment on Counts II and III of Terronics' Second Amended Complaint.

### B.  COUNTS I AND IV

In Count I of its Second Amended Complaint, Terronics claimed that MSC breached the terms of the agreement by failing to pay $250,000 on April 1, 2002, by failing to pay $143,400 in the year 2002, and by failing to pay $440,000 on April 1, 2003, April 1, 2004, April 1, 2005, and April 1, 2006.  Terronics therefore sought damages for breach of contract in the total amount of $2,153,400.  Terronics also asked this court to enter an order compelling MSC to transfer the technology back to Terronics, including the re-assignment of the patents to Terronics.  In Count IV, Terronics sought injunctive relief compelling MSC to transfer the technology and re-assign the patents to Terronics.

In its Motion for Summary Judgment, MSC argues that none of these claims have any merit and that it is entitled to judgment as a matter of law.  This court agrees.

In its Response, Terronics argues that there are genuine issues of material fact that preclude summary judgment.  Terronics first argues that MSC was required to pay Terronics $250,000 on April 1, 2002.   MSC argues that it satisfied its $250,000 payment obligation by crediting that amount against the balance due on Terronics' promissory note.  Terronics does not specifically address MSC's contention that it could properly credit this amount against the amount due under the promissory note.  However, its argument appears to be that there is a genuine issue of fact

regarding whether the promissory note had been amended as set out in Escallon's October 19, 2001, letter[12] and that, if the promissory note had been amended, MSC no longer had that right.  Terronics has not cited any supporting authority for this argument.  In its Reply, MSC has argued that no genuine issue of material fact exists because the Uniform Commercial Code does not permit oral cancellation of a promissory note, because Escallon's assertion of a oral agreement was conclusory and not adequately supported, and because any such oral agreement would not be binding under the Statute of Frauds.

This court agrees that there is no genuine issue of material fact regarding whether MSC breached the agreement by crediting the $250,000 payment against the balance due on the promissory note.  The promissory note clearly stated that, after April 1, 2001, MSC could "at its sole discretion credit minimum fees due . . . to any remaining outstanding balance."  This court agrees with MSC that the promissory note is a negotiable instrument which could not be orally modified.

"A negotiable instrument is an unconditional promise or order to pay, either to order or to bearer, a sum certain on demand or at a definite time, signed by the maker or drawer."  In re W-S Assocs., 1996 WL 691347, at *7 (Bank. N.D. Ill. 1996), citing 810 Ill. Comp. Stat. 5/3-104.  In this case, the promissory note stated that Terronics agreed to pay, to the order of MSC, the sum of $258,484.00 together with any interest on any unpaid balance at seven percent (7%) compounded monthly on or before April 1, 2002.  The promissory note was signed by Escallon as president of Terronics.  This document therefore meets all the requirements of a negotiable instrument and Article 3 of the Uniform Commercial Code, as enacted in Illinois, applies to the interpretation of the promissory note.  See In re W-S Assocs., 1996 WL 691347, at *7.  Section 3-604 (formerly 3-605)

---

[12]  There clearly is a dispute of fact on this point.  Escallon stated in his affidavit that Edwards agreed to the terms set out in the letter.  However, Edwards stated in his affidavit that he did not agree and did not sign the letter because its contents were "not true."

of the Uniform Commercial Code provides:

> A person entitled to enforce an instrument, with or without consideration, may discharge the obligation of a party to pay the instrument (i) by an intentional voluntary act, such as surrender of the instrument to the party, destruction, mutilation, or cancellation of the instrument, cancellation or striking out of the party's signature, or the addition of words to the instrument indicating discharge, or (ii) by agreeing not to sue or otherwise renouncing rights against the party by a signed writing.

810 Ill. Com. Stat. 5/3-604(a) (West 2002).  Therefore, the Uniform Commercial Code does not permit oral cancellation of negotiable instruments, including a promissory note.  See Investors Title Ins. Co. v. Sturdivant, 2005 WL 2128607, at *3 (N.C. Ct. App. 2005); Grant v. Marshall, 762 N.Y.S.2d 280, 281 (N.Y. App. Div. 2003); Matter of Goggins, 642 N.Y.S.2d 924, 925 (N.Y. App. Div. 1996).  Although Terronics claims that the promissory note was orally modified to cancel at least $100,000 of the amount due on the note, there is no signed writing as required by the Uniform Commercial Code.  See First Commerce Bank v. Dockery, 615 S.E.2d 314, 316 (N.C. Ct. App. 2005).  This court notes that Terronics appears to have recognized the need for a signed writing. The October 19, 2001, letter included a signature line for Edwards, who did not sign it.  The letter also stated that Terronics would be "pleased to sign a suitable Note document" encompassing the terms set out in the letter.  This was not done.  This court therefore concludes that the promissory note was not effectively modified.  This court agrees with MSC that it properly, under the clear terms of the promissory note, credited the $250,000 payment due on April 1, 2002, against the remaining balance due on the promissory note.  MSC is entitled to summary judgment on Terronics'

25

claim that MSC owes $250,000.

As far as Terronics' claim that MSC owes $143,400 under the third written agreement for the year 2002,  MSC acknowledges that, under the terms of the third written agreement, it promised to purchase $143,400 in consulting services, equipment and engineering from Terronics during the period of April 1, 2002, to March 31, 2003.  MSC argues, however, that it was not legally obligated to do so because Terronics expressly repudiated its promise to provide MSC with consulting services, equipment and engineering when it stated that it would "consider the [a]greement terminated" and notified MSC that it would "no longer provid[e] support to MSC activities" in May 2002.

"An anticipatory breach occurs when a party to an executory contract manifests a definite and unequivocal intent prior to the time fixed in the contract that it will not render its performance under the contract when that time arrives." Farwell Constr. Co. v. Ticktin, 405 N.E.2d 1051, 1060 (Ill. App. Ct. 1980).  "In such a case, the other party may treat the contract as ended." Farwell Constr. Co., 405 N.E.2d at 1060.  "[I]n the face of clear evidence of an intent to repudiate, the non-repudiating party is no longer under an obligation to perform." Matter of C & S Grain Co., 47 F.3d 233, 237 (7th Cir. 1995).  In this case, Terronics' letters of May 2002 could not have been more clear and unequivocal.  Terronics unequivocally stated that it would not provide support to MSC as it had promised to do in the agreement.  Therefore, MSC could treat the contract as ended and had no obligation to pay $143,400 for services that were not provided.[13]  Terronics is correct that the issue of anticipatory breach is generally a question of fact.  See Farwell Constr. Co., 405 N.E.2d at 1060.

---

[13]  Terronics has argued that "only a small portion of the services were withheld" but has provided no evidence to support this argument.  Moreover, this argument contradicts the letter sent by Terronics in May 2002 stating that no services would be provided.  It also contradicts Escallon's deposition testimony.  Escallon testified Terronics did not do any work that was invoiced from April 2002 to April 2003.

However, Terronics has not provided any factual support for its position, and, as noted, the undisputed facts in this case show a clear and unequivocal intent by Terronics not to perform its obligations under the agreement.  This court agrees with MSC that, where there can only be one reasonable interpretation of the statements giving rise to the repudiation, this court can make that determination as a matter of law.  See Louis Dreyfus Corp. v. Brown, 709 F.2d 898, 900 (5th Cir. 1983); Gatt Trading, Inc. v. Sears, Roebuck & Co., 2004 WL 2511894, at *13 (N.D. Ill. 2004).  Therefore, MSC is entitled to summary judgment on this claim.

Terronics has also claimed that MSC owes $440,000 for 2003, 2004, 2005 and 2006 based upon Section 10.1.1 of the third written agreement.  Section 10.1.1 states:

> 10.1.1   Renewal.  This Agreement is automatically renewed upon expiration of the term of Section 10.1 ("the First Term") with respect to Metallic Flat Web Applications and Blanked Applications for four (4) additional years ("Additional Term") if the variable fee payment of Article 3.2 exceeds four hundred forty thousand dollars ($440,000.00) for Powder Generated External and Internal Sales of Metallic Flat Web Applications and Blanked Applications in total $5,000,000 for any preceding year of the First Term, and thereafter is automatically renewed for additional four (4) year terms ("Further Additional Term") in the event the variable fee payment of Article 3.2 exceeds nine hundred forty thousand dollars ($940,000.00) for metallic Flat Web Application and Blanked Applications.  Powder Generated External and Internal Sales of Metallic Flat Webb Applications and Blanked Applications exceed $10,000,000 in total

in any preceding year of any such Additional Term or Further Additional Term. MSC may, at its sole discretion, pay the difference between the variable fee or guaranteed minimum paid to Terronics and the minimum variable fee required for renewal in order to invoke the automatic renewal herein provided. This Agreement shall not renew automatically with respect to Non-Metallic Flat Web Applications; provided, however that the Parties agree to negotiate in good faith with respect to separate guaranteed minimum fees, variable fees, and minimum sales for Non-Metallic Flat Web Applications. If, before termination of this Agreement, MSC has developed a Non-Metallic Flat Web Application that is produced using the Technology, MSC shall have the right and license in perpetuity to use the Technology to service the market and Licensees that exist at that time by continuing to abide by MSC's obligations for variable fees only, per Article 3.2, that exist at the time of termination.[14]

MSC argues that, under the unambiguous terms of the third written agreement, the agreement automatically renewed after five years only if MSC achieved sufficient sales of the technology such that it became obligated to pay Terronics a variable fee payment of over $440,000 in any preceding year. MSC points out that it is undisputed that MSC never achieved sufficient sales of the

---

[14] This court notes that Section 10.1.1 contains portions that are handwritten, and some of the handwritten terms are crossed out. This court has done its best to set out the terms remaining in Section 10.1.1 of the written agreement and notes that some sentences do not appear to make much sense. This court has set out the entirety of this section because Terronics has relied on this provision in making its arguments.

technology to trigger any obligation to pay Terronics a variable fee.  MSC argues that the agreement

was either terminated by Terronics in May 2002 or expired by its own terms in August 2003 so that

MSC incurred no additional payment obligations under the terms of the agreement.

Terronics contends that a genuine issue of material fact exists regarding whether it is entitled

to payments under this section totaling $1,760,000.[15]  Terronics contends that MSC continued to

market the Technology for sale after 2002 and, therefore, a question exists regarding whether MSC

automatically renewed the agreement between MSC and Terronics under section 10.1.1.  Terronics

argues that "[t]o hold otherwise would mean that, notwithstanding MSC's continued efforts to

license and/or sell the Technology, MSC would get the Technology for free during the renewal

period after April 2002."  Terronics contends that the language "at its sole discretion" in the renewal

clause of the agreement is ambiguous and also argues that, even if Section 10.1.1 is unambiguous,

a question of fact exists regarding whether MSC modified the renewal clause by its subsequent

actions.  Again, Terronics has cited no pertinent case law authority for its arguments and this court

does not find the arguments persuasive.

This court has recognized that Section 10.1.1 of the agreement contains portions which are

not entirely clear.  However, this court concludes that this section is not ambiguous regarding what

must happen for the agreement to automatically be renewed.  Section 10.1.1 unambiguously

provides that the agreement would be automatically renewed only if the variable fee due under the

agreement exceeded a certain amount or if MSC, at its sole discretion, paid a prescribed amount in

order to invoke the automatic renewal.  MSC is correct that Terronics does not dispute that the

minimum was never reached.  Moreover, the facts show that MSC certainly never made any

discretionary payment in order to invoke the automatic renewal.  This court agrees with MSC that

---

[15]  And that's not all.  In its Response, Terronics stated that it reserved the right to amend
its complaint to allege that it is owed $440,000 for 2007 as well.

there is nothing ambiguous about allowing MSC to make such a payment "at its sole discretion."

See Quinn v. Non-Contributory Nat'l Long Term Disability Program, 113 F. Supp. 2d 1216, 1221

(N.D. Ill. 2000) (terms "in its sole discretion" manifested an "unambiguous vesting of discretion").

Therefore, MSC is correct that neither event required to trigger an automatic renewal of the

agreement occurred.  Therefore, the agreement terminated either in May 2002, when Terronics

notified MSC that it would no longer perform its obligations, or at the end of the five-year term of

the agreement in August 2003.

This court also agrees with MSC that Terronics has produced absolutely no evidence that the

agreement was renewed by performance, modification, or ratification.  In making its arguments,

Terronics states that MSC failed to return technology and continued representing to SMS Demag

that it owned the technology.  In support, Terronics referred to the provision in the agreement that

requires the return of technology, but provided no evidence that MSC still has technology that

should have been returned.  Terronics also referred to documents showing that MSC's license

agreement with SMS Demag was not terminated until April 2004.  This court agrees with MSC that

this proves nothing because, under section 10.6(a) of the agreement, the parties agreed that the

expiration of the agreement "shall have no effect on any license or sub-license of the Technology

granted by MSC prior to and in effect on the date of such expiration."  Under the terms of the

agreement, the expiration of the third written agreement between Terronics and MSC had no effect

on MSC's prior license agreement with SMS Demag.

Under Illinois law, an agreement, when reduced to writing, must be presumed to speak the

intention of the parties.  See Davis, 396 F.3d at 878.  In this case, the written agreement is clear and,

based upon the terms of the agreement, Terronics has no claim for $440,000 in yearly fees.

Terronics could only succeed on its claim by extensive revision of the terms of the agreement.  As

this court has stated previously, "courts are not in the business of rewriting contracts to appease a disgruntled party unhappy with the bargain it struck." <u>Davis</u>, 396 F.3d at 881.  This court therefore concludes that MSC is entitled to summary judgment on this claim.

MSC also argues that it is entitled to summary judgment on Terronics' claim for reassignment of the patents.  MSC has pointed out that section 10.6(b) of the third written agreement is the only provision that speaks specifically on the issue of patent reassignment and this provision obligated MSC to reassign the patents only if the agreement was "terminated by MSC."  MSC has shown that this provision was inserted into the third written agreement to address reassignment of the patents in response to Terronics' concern about what would happen to the patents if MSC terminated the agreement.  According to MSC, the earlier two written agreements between the parties did not include an assignment of patents.  MSC therefore pointed out the distinction between this provision and section 10.2, which was identical to a provision included in the parties' earlier agreement (which did not address patent assignment) and required MSC to "return to Terronics all the Technology capable of being returned" if the agreement was terminated or expired.  MSC very clearly argued that Terronics cannot succeed on its claim seeking an order compelling MSC to return the patents, because the agreement only required MSC to reassign the patents if the agreement was terminated by MSC, which it is undisputed it was not.

In its Response to MSC's very clear argument based upon the express terms of the agreement, Terronics did not address the two distinct provisions in the agreement.  Instead, Terronics claimed that "MSC's interpretation of the contract is that if the contract terminated on its own and not by any affirmative action by MSC, then MSC could still retain the assigned patents and technology."  Terronics then stated that this position was "perplexing."  Terronics concluded by arguing that the question of whether MSC breached the agreement by retaining the patents is a

31

question of fact for trial.

Under Illinois law, a contract "must be construed as a whole, taking into account the overall purpose of the contract, and the context in which the language is used." K's Merch. Mart, Inc. v. Northgate Ltd. P'ship, 835 N.E.2d 965, 971 (Ill. App. Ct. 2005). "[I]t is presumed that all provisions were inserted for a purpose, and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions." Bruno Benedetti & Sons, Inc. v. O'Malley, 464 N.E.2d 292, 297 (Ill. App. Ct. 1984). Thus, a contract must be "construed such that none of its terms are regarded as mere surplusage." Fontana v. TLD Builders, Inc., 840 N.E.2d 767, 784-85 (Ill. App. Ct. 2005).

This court concludes that MSC's argument is not "perplexing" at all. Under the clear terms of the written agreement, MSC is not required to reassign the patents unless it terminated the agreement, which it did not. MSC was required to return technology (as distinct from the patents) if the agreement terminated or expired. However, as noted previously, Terronics has provided no evidence of any kind that MSC has retained technology that it should have returned.[16] Accordingly, this court concludes that MSC is entitled to summary judgment on this claim.

## C.  COUNTERCLAIMS

MSC contends that it is entitled to summary judgment on its counterclaims against Terronics

---

[16] In a separate portion of its argument, Terronics contended that "only at trial can it ever be known what technology MSC used after termination of the agreement, and whether this technology or any documentation related thereto appropriately belonged to MSC or whether it was technology belonging to Terronics." Terronics provided no explanation regarding why it did not explore during discovery the question of what technology MSC retained or used after termination of the agreement. It seems clear to this court that evidence regarding this question could have been obtained during discovery. Without any evidence that MSC retained technology belonging to Terronics, Terronics has not shown that there is a genuine issue of material fact for trial. It is well settled that, when faced with a summary judgment motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248.

because it is undisputed that Terronics has not paid the balance remaining due on the promissory note and because it is undisputed that MSC paid Terronics $32,180 for work Terronics did not perform.

Terronics only response to this argument is that "MSC is due nothing" because "Terronics has the right to setoff any amount claimed by MSC because the Terronics' claims succeed." This court has, however, already concluded that MSC is entitled to summary judgment on all of Terronics' claims. Therefore, Terronics' argument that it is entitled to a setoff is without merit and MSC is entitled to summary judgment on its counterclaims.

### D.  CONCLUSION

For all of the reasons stated, this court concludes that MSC is entitled to summary judgment on Terronics' Second Amended Complaint. This court further concludes that MSC is entitled to summary judgment on its Amended Counterclaim against Terronics. However, MSC has not submitted evidence to establish the amount owed under the promissory note. This case is therefore scheduled for a telephone status conference on December 21, 2007, at 10:30 a.m. so that a hearing on damages can be scheduled.

IT IS THEREFORE ORDERED THAT:

(1)  MSC's Motion for Summary Judgment (#65) is GRANTED.

(2)  MSC is directed to file, within 14 days, an affidavit setting out the citizenship of SMS Demag pursuant to 28 U.S.C. § 1332(c)(1). Once this court has confirmed that it has diversity jurisdiction over this case, judgment will be entered in favor of MSC and against SMS Demag.

(2)  MSC's Motion for Summary Judgment (#66) is GRANTED. Judgment is entered in favor of MSC and against Terronics on Terronics' Second Amended Complaint (#54). This case is scheduled for a telephone status conference on December 21, 2007, at 10:30 a.m. so that a hearing

on the amount of damages due on MSC's counterclaim can be scheduled.

ENTERED this 21st day of November, 2007

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE